**MERCURY CAPITAL
CORPORATION,**
Appellant,

v.

**MILFORD CONNECTICUT
ASSOCIATES, L.P.,**
Appellee.

Civil Action No. 3:05cv1974(SRU).

United States District Court,
D. Connecticut.

Oct. 12, 2006.

**4**

Bruce Buechler, S. Jason Teele, Lowenstein Sandler, Roseland, NJ, Matthew B. Woods, Goldman, Gruder & Woods, Norwalk, CT, for Mercury Capital Corp., Appellant.

Jeffrey M. Sklarz, Zeisler & Zeisler, P.C., Bridgeport, CT, for Milford CT Assoc. LP, Appellee.

### MEMORANDUM OF DECISION

STEFAN R. UNDERHILL, District Judge.

This is an appeal from an order of Chief United States Bankruptcy Judge Albert S. Dabrowski confirming the debtor's Chapter 11 reorganization plan. Both the debtor, Milford Connecticut Associates (hereinafter "the debtor") and its secured creditor, Mercury Capital Corporation (hereinafter "Mercury"), submitted plans for reorganization. After a hearing, the Bankruptcy Court found both plans to be confirmable but selected the debtor's plan over Mercury's plan. Mercury claims that the Bankruptcy Court erred because it: (1) failed to make findings of fact; (2) found that the debtor's plan satisfied the confirmation requirements set forth in 11 U.S.C. § 1129(a); (3) determined that the debtor's plan satisfied the "cram down" requirements set forth in 11 U.S.C. § 1129(b); and (4) decided that the debtor's plan should be confirmed over Mercury's plan. The Bankruptcy Court did not necessarily err as a matter of law when it confirmed the debtor's plan over Mercury's plan. Because there is insufficient evidence in the record, however, to support the Bankruptcy Court's order on certain issues, the Bankruptcy Court's ruling is vacated and remanded for further proceedings consistent with this decision.

### I. Factual and Procedural Background

In February 1986, the debtor, a New Jersey limited partnership, acquired a piece of real estate located at 265–269 Old Gate Lane, Milford, Connecticut (hereinafter "the property"). Debtor's First Amended Disclosure Statement, p. 7 (Oct. 3, 2005). The property covers 15.39 acres and contains three dilapidated one-story industrial buildings. *Id.* The buildings are no longer usable. *Id.* The property is currently vacant and generates no income. *See id.* Nevertheless, the property appears to have risen significantly in value since a neighboring piece of property, a former jai alai fronton, was optioned to a national real estate developer and Lowe's Home Centers, Inc. subsequently approved the jai alia property as a site for one of its stores. Transcript of Bankruptcy Court Confirmation Hearing, p. 110 (Nov. 9, 2005) (hereinafter "Hearing Transcript").

On February 2, 2004, the debtor filed a voluntary petition for bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code. Mercury, the debtor's largest secured creditor, had initiated a state court foreclosure action and was about to foreclose, when the bankruptcy was filed and the foreclosure was stayed. Appellant's Brief p. 3. The debtor owes Mercury $5,600,000.00, the City of Milford $261,920.05, various retail stores $127,000,

and other general unsecured creditors $89,865.80. *Id.* at 6.

Both Mercury and the debtor submitted plans for reorganization to the Bankruptcy Court. The most significant difference between the plans involves the timeline upon which the debtor's assets will be liquidated. The Mercury plan calls for the property to be sold within one year of the plan's confirmation, whereas the debtor's plan would allow thirty months to market and sell the property. *Id.*

The debtor's plan provides that Mercury will be paid the full principal amount of its monetary claim. The plan states that "[i]n full satisfaction and discharge of [Mercury's] Claim, [Mercury] shall receive the First Mortgage Note." Debtor's First Amended Plan of Reorganization, p. 7, ¶ 5.2. The debtor's plan defines "first mortgage note" as:

> a Note in an amount equal to the allowed amount of the Mercury Secured Claim with the following terms: (1) Secured by a first mortgage on the Realty (2) accruing interest at the rate of a 3 year U.S. Treasury Note as of the Confirmation Date, plus 200 basis points, on a thirty-year amortization schedule with a final payment of the balance due 30 months after the Confirmation Date (3) payable in equal monthly payments of principal and interest commencing on the later of the Effective Date or when the Mercury Secured Claim is allowed (4) prepayable in whole or in part without penalty, and (5) if the holder of the Mercury Secured Claim rejects this Plan, such other or different terms as required by the Court to comply with Section 1129(b)(2)(A) of the Code.

Debtor's First Amended Plan of Reorganization, p. 3–4, ¶ 2.14.

Immediately before the confirmation hearing, Jeffrey Sklarz, the debtor's attorney, called the City of Milford's and the retail stores' attorneys. Hearing Transcript at 13–14. Sklarz intended to discern why those creditors had not yet voted on a reorganization plan. *Id.* at 13. According to Sklarz, the attorneys for the creditors said they had not voted because "they needed to talk to their respective clients." *Id.* at 23. At that point, "a conversation ensued. And the fruition . . . of the conversation was [a] modification" of the debtor's plan. *Id.* Specifically, the debtor modified the plan to include a two percent increase of the City of Milford's interest rate and a $25,000 cash down payment on its claim. Debtor's Motion to Modify First Amended Plan of Reorganization p. 2. The debtor also agreed not to challenge the amount of retail stores' secured claim of $127,000. *Id.* at 3. In an order issued November 21, 2005, the Bankruptcy Court granted the debtor's Motion to Modify the plan. In a footnote in a later confirmation order, the Bankruptcy Court noted that "[u]nder Bankruptcy Rule 3019, the Court determines that the modification proposed 'does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification. . . .' " *In re Milford Connecticut Associates, L.P.,* 04–30511(ASD) p. 1 n. 1 (Bankr.D.Conn.2005).

On November 21, 2005, the Bankruptcy Court confirmed the debtor's reorganization plan. In the confirmation order, the Bankruptcy Court reasoned that:

> [t]he Court, having now fully considered the entire record in this case, determines that both of the Competing Plans are "confirmable," in that they each meet the standards for confirmation set forth in Bankruptcy Code Sections 1129(a) and (b). Nonetheless, under the terms of Section 1129(c), the Court may only confirm one plan, and in doing so, must "consider the preferences of credi-

tors and equity security holders." In the present case the Court finds and concludes that all equity security holders and all voting creditors, with the exception of Mercury, prefer the Debtor's Plan over the Mercury Plan.

*Id.* at 1–2.

Mercury now appeals the Bankruptcy Court's decision on almost every conceivable legal ground. First, it argues that the Bankruptcy Court did not make sufficient findings of fact from which it can appeal the judgment. Second, it argues that the debtor's plan fails to conform to Section 1129(a). Specifically, Mercury claims that the plan is not feasible because it does not provide funding to pay the debtor's ongoing expenses throughout the thirty-month marketing period. Additionally, Mercury claims that the plan was not proposed in good faith because the debtor allegedly solicited votes on the eve of the confirmation hearing. Moreover, Mercury claims that the plan fails to provide attorneys' fees, costs and other charges due under the pre-petition mortgage note. Finally, Mercury argues that the plan fails the "best interest of the creditors" test because Mercury would be better off under a Chapter 7 liquidation than under the debtor's plan.

Third, Mercury contends that the debtor's plan fails to conform to the cram-down requirements set forth in 11 U.S.C. § 1129(b). Specifically, it argues that the plan unfairly discriminates against Mercury because it calls for a $25,000 down payment and eight percent interest rate payable to the City of Milford but Mercury would not receive any down payment and only a 6.125 percent rate. Additionally, the debtor's plan would prevent Mercury from foreclosing on the property at will.

Finally, Mercury argues that the Bankruptcy Court improperly exercised its dis-cretion when it confirmed the debtor's plan over Mercury's own plan.

The debtor also filed a cross-appeal in which it argues that the plan Mercury submitted is not confirmable.

## II. Discussion

To decide which reorganization plan to confirm, a court must first determine whether one or more of the proposed plans is confirmable. To be confirmable, a reorganization plan must first meet all the requirements set forth in the Bankruptcy Code, 11 U.S.C. § 1129(a). The requirements relevant to this case include the following: the plan must be proposed in good faith, 11 U.S.C. § 1129(a)(3); the plan must be in the "best interests" of the creditors, 11 U.S.C. § 1129(a)(7); each class of claims or interests must accept the plan or must not be impaired under the plan, 11 U.S.C. § 1129(a)(8); and the plan is not likely to be followed by liquidation, or the need for further financial reorganization, unless the liquidation or reorganization is proposed in the plan, 11 U.S.C. § 1129(a)(11).

If a party to the reorganization objects to a plan, the plan may still be confirmed if the plan satisfies the "cram-down" requirements set forth in 11 U.S.C. § 1129(b). The cram-down requirements relevant to this case include the following: the plan must be fair and equitable to the dissenting parties, 11 U.S.C. § 1129(b)(1); and the plan cannot violate the absolute priority rule, 11 U.S.C. § 1129(b)(2). Finally, if the court finds two or more plans to be confirmable, the court must choose only one plan to confirm. 11 U.S.C. § 1129(c). Mercury's numerous arguments are addressed in sequential order.

### A. Standard of Review

District courts review Bankruptcy Courts' conclusions of law *de novo,* and

their findings of fact for clear error. FED. R. BANKR.P. 8013; *In re Karta Corp.*, 342 B.R. 45, 51 (S.D.N.Y.2006). For determinations of mixed law and fact, district courts review the facts underlying such determinations for clear error but review the legal questions de novo. *See In re Pine Mountain, Ltd.*, 80 B.R. 171, 172 (9th Cir.1987). "Matters and decisions within the discretion of the bankruptcy judge will not be disturbed unless we find that no reasonable man could agree with the decision." *In re AM International, Inc.*, 67 B.R. 79, 81 (N.D.Ill.1986). The decision to confirm one reorganization plan over another reorganization plan is a matter within the Bankruptcy Court's discretion and is reviewed for an abuse of discretion. *Pine Mountain*, 80 B.R. at 172.

### B. The Bankruptcy Court's Failure to Make Explicit Findings of Fact, By Itself, Is Not Sufficient Grounds For Reversal.

Federal Rule of Civil Procedure 52(a), made applicable to Bankruptcy Courts by Federal Rule of Bankruptcy Procedure 7052, provides that "[i]n all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon." *Id.* Bankruptcy Rule 9014, however, grants bankruptcy courts "discretion in a contested matter, ... as distinct from an adversary proceeding, to disregard B.R. 7052, which requires detailed findings of fact and separate conclusions of law in litigated adversary proceedings." *In re Evans Products Co.*, 65 B.R. 31, 34 (Bankr. S.D.Fla.1986). Other courts have held that "where it is possible to determine the bases upon which the court below acted, and the record is clear enough for the appellant to recognize those grounds, the appellant has not been prejudiced and error in the court below's failure to comply

with Rule 52(a) is harmless." *In re Blaise*, 219 B.R. 946, 948 (2d Cir. BAP 1998).

In this case, the vast majority of the Bankruptcy Court's ruling is either supported by the record or does not rest on disputed facts. The record in this case includes, among other documents, copies of both reorganization proposals, the parties' disclosure statements and the transcript of the confirmation hearing. Accordingly, this court need not, as a general matter, remand the entire case for more fact finding. For reasons that follow, however, the Bankruptcy Court should hold a hearing on at least a few specific issues.

### C. Confirmation Requirements, 11 U.S.C. § 1129(a)

#### 1. The Debtor's Plan Does Not Violate 11 U.S.C. § 1129(a)(3) Because It Was Not Proposed in Bad Faith

Section 1129(a)(3) provides that a reorganization plan must be "proposed in good faith and not by any means forbidden by law." *Id.* Good faith is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Matter of Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984). Moreover, a plan is proposed in good faith only if it has "a legitimate and honest purpose to reorganize the debtor." *In re Elsinore Shore Assoc.*, 91 B.R. 238, 260 (Bankr.D.N.J.1988). Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances. *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984). "The bankruptcy judge is in the best position to assess the good faith of the parties' proposals." *Id.* In this case, Mercury argues that the debtor solicited confirmation votes in bad faith when it called certain creditors to solicit

votes on the eve of the confirmation hearing.

■ The Bankruptcy Judge found, however, that the debtor's plan was proposed in good faith. After he heard a direct account of the phone call from the debtor's attorney the Judge held that "[b]ased upon the representations of counsel, specifically Mr. Sklarz, which I accept to define the factual parameters of what we're dealing here, I simply cannot find a sufficient basis ... to make a finding that [the votes] were procured or solicited in bad faith as the statute 1126(e) states in accordance with the provisions of this title." Hearing Transcript at 27. The Bankruptcy Judge was certainly in the best position to assess Sklarz' credibility, and thus the debtor's good faith, because Sklarz presented the relevant facts before the Court. Additionally, there exists no evidence in the record to contradict the finding. The Bankruptcy Court therefore did not abuse its discretion when it found the debtor proposed its plan in good faith.

2. **On Remand, the Bankruptcy Court Should Consider Whether the Debtor's Plan, by Extinguishing Mercury's Pre–Petition Guarantees, Complies With the Best Interests of the Creditors Test as Set Forth in 11 U.S.C. § 1129(a)(7).**

■ To comply with 11 U.S.C. § 1129(a)(7), a reorganization plan must satisfy the best interests of the creditors test. *Id.* A plan comports with the best interests of the creditors test only if:

[w]ith respect to each impaired class of claims or interests (A) each holder of a claim or interest of such class (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such

claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title.

*Id.* The reorganization plan must essentially provide any dissenting creditor at least as much value as the dissenting creditor would receive under a Chapter 7 liquidation. *United States v. Reorganized CF & I Fabricators, Inc.,* 518 U.S. 213, 228, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996).

Mercury argues that it would be better off under a Chapter 7 liquidation for two reasons.[1] First, it argues that under a Chapter 7 liquidation it would continue to receive the benefit of pre-petition guarantees by non-debtor guarantors, whereas the debtor's plan releases those guarantees. Second, it argues that under a Chapter 7 liquidation the trustee would seek to sell the property as quickly as possible, whereas the debtor's plan calls for a sale of the property over a thirty-month period.

■ Mercury's second argument is without merit. Under the appropriate circumstances, courts have held that it is better to wait and sell property at its maximum value than to force a sale at a lower price. *See, e.g., In re Neff,* 60 B.R. 448, 453 (Bankr.N.D.Tex.1985). For example, the *Neff* court held that:

[i]n the event of an immediate Chapter 7 liquidation, the Court finds that the secured creditors of the estate might be able to satisfy their claims through foreclosure, but that the forced sale of real property and horses which constitute the bulk of the assets of the estate would probably result in significantly lower values than those values which might be realized over time, especially in

---

**1.** Mercury also argues that the debtor's plan violates the best interests of the creditors test because it would pay unsecured creditors be- fore Mercury. This argument, however, raises issues that implicate the absolute priority rule that are addressed in a later section.

view of present economic conditions. The unsecured creditors, therefore, would suffer significant harm.... [T]he proposed Plan of Reorganization [thus] represents the best method for the realization of maximum return to both secured and unsecured creditors of the estate.

*Id.* at 452. In this case, the record permitted the Bankruptcy Court to find both that the debtor's plan was confirmable, and that the debtor's plan better protects the interests of all creditors. Mercury's plan reflects its desire to foreclose on the property immediately and take its share of the proceeds, plus interest, without regard to the effect on other creditors. The Bankruptcy Court's decision reasonably reflects the view that, by marketing the property, the debtor's plan will give all creditors the best chance to be paid.

 The validity of Mercury's first argument is less clear. As an initial matter, the debtor argued that its plan does not extinguish Mercury's pre-petition guarantees because its plan makes no mention of the guarantees. The mortgage note that Mercury will receive under the debtor's plan, however, acts as a substitute for the note Mercury currently holds. By not mentioning the pre-petition guarantees, the debtor's plan therefore appears to extinguish Mercury's pre-petition guarantees. Extinguishing the pre-petition guarantees provides the debtor's guarantors a windfall and would seem to leave Mercury with no recourse if the plan fails. Therefore, it appears that Mercury may be significantly less secured under the debtor's plan than under a Chapter 7 liquidation. Although the Bankruptcy Court ultimately may be correct that the debtor's plan satisfies the best interests of the creditors test, there is not sufficient evidence in the present record to support its order on those grounds. Upon remand, the Bankruptcy Court should directly address these questions.

### 3. The Debtor's Plan Does Not Violate 11 U.S.C. § 1129(a)(11) Because the Plan is Feasible.

 Section 1129(a)(11) provides that a plan is confirmable only if "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). A "relatively low threshold of proof" will satisfy the feasibility requirement. *In re Brotby,* 303 B.R. 177, 191 (9th Cir.2003). "The feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988).

 Mercury claims that the debtor's plan is not feasible because the plan does not explicitly provide for any exit financing or post-confirmation infusion of funds. The debtor's plan, however, does provide that:

[t]he holders of Allowed Equity Interests will invest and/or loan the Reorganized Debtor the funds necessary to meet the obligations under the Plan due prior to the sale of the Realty, such as the payments on the First and Second Mortgage Notes, payments to professionals, and other ongoing expenses of the Reorganized Debtor.

Debtor's First Amended Plan of Reorganization, p. 8, § 6. Moreover, the debtor's plan provides that "United States Land Resources, L.P. will remain the General Partner of the Debtor." *Id.* at p. 8, § 7. As the debtor's general partner, USLR is obligated under New Jersey partnership law to fund the plan. The Bankruptcy Court therefore did not err when it found the debtor's plan to be feasible. On remand, however, the Bankruptcy Court

should nevertheless consider whether, in light of USLR's history of failing to meet the debtor's financial obligations, the debtor's plan ought to include a clause that explicitly requires USLR to fund the debtor's plan.

### C. Cram–Down Requirements, 11 U.S.C. § 1129(b)

### 1. The Debtor's Plan Does Not Violate 11 U.S.C. § 1129(b)(1) Because It Does Not Unfairly Discriminate Against Mercury.

 Section 1129(b)(1) provides that a court should confirm a plan over a party's objection only "if the plan does not discriminate unfairly ... with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). The Code does not forbid a plan from classifying claims differently, even if the claims share similar attributes. *See In re Jersey City Medical Center*, 817 F.2d 1055, 1060–61 (3d Cir. 1987) "[I]t remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case.... Accordingly, we agree with the general view which permits the grouping of similar claims in different classes." *Id.*

 The Code only prohibits discrimination between classes if the discrimination is unfair. A plan unfairly discriminates against a class if similar claims are treated differently without a reasonable basis for the disparate treatment. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr.S.D.N.Y.1990). "[F]or discriminatory treatment of claims to be fair, four tests must be satisfied: (i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale." *Id.* In this case,

Mercury argues that the plan is unfairly discriminatory because it provides a $25,000 down payment and a 1.875 percent higher interest rate to the City of Milford.

The debtor, by contrast, argues that the separate classification of Milford and Mercury's claims is reasonable due to the different nature of the two claims. Specifically, because Milford's potential claim against the debtor's general partner is for tax assessed against the debtor's property, Milford is unable to obtain a deficiency judgment against the debtor's general partner to the extent that its claim "exceeds the value of the interest of the estate in such property." 11 U.S.C. § 502(b)(3). Mercury has no such restriction. Other courts have found that the relative degree of risk to two particular claims is a valid reason for a plan to discriminate. *See In re Nelson*, 133 B.R. 786, 792 (Bankr. D.Miss.1991) (holding that "[h]ere, the slight degree of 'discrimination' is justified. The difference in interest rates can be attributed to a slightly higher degree of risk that the Class II claimant bears because of its second priority status."). If the debtor is correct, the Bankruptcy Court did not err when it found that the separate treatment was reasonable, necessary, proposed in good faith, and directly proportional to its rationale. There is not sufficient evidence in the record, however, to determine whether the debtor's representations in this appeal are accurate, or whether the Bankruptcy Court deemed the differences in the nature of the two claims sufficient to justify the plan's different treatment of the relative claims.

### 2. On Remand, the Bankruptcy Court Should Consider Whether Either of the Competing Plans Provides a Fair and Equitable Interest Rate, as Defined by 11 U.S.C. § 1129(b)(1).

Section 1129(b)(1) provides that a court should confirm over a party's objection "if

the plan ... is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). The Code further provides that:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides-

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2).

Mercury contends that the plan violates 11 U.S.C. § 1129(b)(2)(A)(ii) because it forces it to accept a below-market interest rate on the new first mortgage note. The debtor's plan offers Mercury a 6.125 percent interest rate, whereas Mercury contends that the market value of a coerced loan of this nature is at least 12.25 percent. Mercury's plan, in turn, provides Mercury a fifteen percent interest rate.

In this case, Mercury's plan purportedly used a market interest rate for the imposed loan from Mercury. The debtor's plan, and by extension, the Bankruptcy Court, purportedly applied the formula that the United States Supreme Court articulated in *Till v. SCS Credit Corp.,* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), to calculate the interest rate Mercury will receive under debtor's plan. At the outset, the parties disagree about whether the *Till* formula even applies to the current case. *Till* did not directly address how the rate of interest should be determined in a Chapter 11 bankruptcy case.[2] Courts have held, however, that "a Bankruptcy Court deciding upon a interest rate in a Chapter 11 case should apply the market rate of interest where there exists an efficient market. And, when no efficient market exists for a Chapter 11 debtor, then the Bankruptcy Court should employ the formula approach endorsed by the *Till* plurality." *Interim Capital, LLC v.*

2. The *Till* court briefly considered that question in a footnote. "[T]here is no readily apparent Chapter 13 cram down market rate of interest: Because every cram down loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cram down lenders. Interestingly, the same is not true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession.... Thus, when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce. In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure." *Till,* 541 U.S. at 477 n. 14, 124 S.Ct. 1951.

*Hank's Dock, Inc.*, 2006 U.S. Dist. LEXIS 66827, *6 (D.Tenn.2006) (citing *Till*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787; *In re American HomePatient, Inc.*, 420 F.3d 559 (6th Cir.2005)); *see also In re Cantwell*, 336 B.R. 688 (Bankr.D.N.J. 2006). The Bankruptcy Court therefore did not necessarily err as a matter of law when it applied the *Till* formula.

 There is not enough evidence in the record, however, to uphold the Bankruptcy Court's confirmation order in at least a few respects. First, there is not enough evidence in the record to determine whether an efficient market rate exists for the type of loan that Mercury will give the debtor under competing plans, and whether it would be more appropriate to impose that market rate or to apply the *Till* formula. The Bankruptcy Court considered only a few limited pieces of evidence about the existence of an efficient market rate. Specifically, the court considered the testimony of Mercury's president, Marc Gleitman. When asked, "[d]o you believe that if the debtor went to a third party, it could get someone to give them a loan in accordance with the proposal set forth by the debtor for [the debtor's property] in its current condition?" Gleitman responded "[i]n its current circumstances, which are not much different than the circumstances under which we made the loan originally, I think he would be hard pressed to find a loan at anything less than double that rate." Hearing Transcript at 155. The Bankruptcy Court also presumably considered the fifteen percent interest rate that Mercury gave the debtor in its original mortgage note. Neither piece of evidence, however, is suf-

ficient to establish whether or not an efficient market rate exists for the type of loan Mercury must give the debtor under the debtor's plan, and if so, what that interest rate is.

 Second, the debtor's plan did not apply the *Till* formula correctly. *Till* requires courts to "begin[ ] by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Till*, 541 U.S. at 478–79, 124 S.Ct. 1951. In this case, there is no testimony adduced about, nor judicial notice taken of, the national prime rate. The debtor's plan instead provides that interest on Mercury's note will accrue "at the rate of a three year U.S. Treasury Note as of the Confirmation Date, plus 200 basis points, on a thirty year amortization schedule with a final payment of the balance due thirty months after the Confirmation Date." Debtor's First Amended Plan of Reorganization, p. 5, ¶ 2.23. If the Bankruptcy Court elects to apply the *Till* formula, or the "prime-plus" rate, it must at least consider that rate before deviating from it.[3] In addition, *Till* held that:

> Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the

---

3. The Prime rate is the interest rate at which a creditworthy commercial borrower can borrow money. As such, it is an appropriate starting point from which to construct the rate at which a bankrupt debtor could borrow. Here, the debtor's plan starts not with

the prime rate, but with the rate payable on a three-year treasury note, which is the rate at which the United States government can borrow. Accordingly, it is not obvious that the treasury note rate provides an appropriate starting point for the *Till* analysis.

nature of the security, and the duration and feasibility of the reorganization plan. The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment.

*Till*, 541 U.S. at 479, 124 S.Ct. 1951. In this case, the Bankruptcy Court did not hold a hearing regarding the degree to which the debtor's plan should adjust the applicable base rate to compensate for risks. Therefore, on remand, the Bankruptcy Court should consider: (1) does an efficient market rate exist for the type of loan Mercury is forced to give the debtor under the competing plans; (2) if there is no efficient market rate and it is thus appropriate to apply *Till* formula, what was the national prime rate on the relevant date; (3) is it appropriate to use the national prime rate or some other rate; and (4) to what extent is it appropriate to deviate from the applicable rate to account for risk.

### 3. The Debtor's Plan Does Not Violate the Absolute Priority Rule

The absolute priority rule, codified by 11 U.S.C. § 1129(b)(2)(B)(ii), provides that "[w]ith respect to a class of unsecured claims—the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." *Id.* "In plainer English the provision bars old equity from receiving any property via a reorganization plan 'on account of its prior equitable ownership when all senior claim classes are not paid in full.'" *In re Bonner Mall Partnership*, 2 F.3d 899, 908 (9th Cir.1993).

Mercury contends that the debtor's plan violates the absolute priority rule because it pays unsecured creditors before it pays the senior creditors, and because Mercury will only be paid if the property is sold within thirty months as the plan contemplates. As an initial matter, there is some dispute over whether Mercury has standing to raise the absolute priority rule. Some courts hold that the language of Section 1 129(b)(2)(B)(ii) clearly indicates that the absolute priority rule does not apply to secured creditors. *See, e.g., In re Arden Properties, Inc.*, 248 B.R. 164, 173–74 (Bankr.D.Ariz.2000); *In re Sagewood Manor Associates L.P.*, 223 B.R. 756, 772–74 (Bankr.D.Nev.1998). Other courts hold that the absolute priority rule does apply to secured creditors. *See, e.g., In re Miami Center Associates, Ltd.*, 144 B.R. 937, 941 (Bankr.S.D.Fla.1992). The statutory language itself clearly limits Section 1129(b)(2)(B) to classes of "unsecured claims." *Id.*

Assuming that Mercury has standing to raise the absolute priority rule, however, the debtor's plan still does not violate the rule.

> It must be remembered that the absolute priority rule does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan.

*Matter of Penn Cent. Transp. Co.*, 458 F.Supp. 1234, 1283 (E.D.Pa.1978); *see also Arden Properties*, 248 B.R. at 174. "[E]ven if the concept of § 1129(b)(2)(B) were somehow applied to secured claims, it still would not require *payment* before a junior class could receive anything; it merely means that senior classes must be fully provided for in order for junior classes to receive anything." *In re Arden Properties*, 248 B.R. at 174 (emphasis added).

> Must the money be in hand at the date of confirmation to satisfy the absolute

priority rule? We think not, so long as its provision is established by uncontested findings of the bankruptcy court which are not clearly erroneous, and which "provide for" such payments in accordance with the feasible confirmed plan.

*In re Johnston*, 21 F.3d 323, 330–31 (9th Cir.1994).

▇ In this case, the debtor's plan provides that Mercury will be paid in full at the end of the thirty-month period. Such a plan does not violate the absolute priority rule "simply because the payment term to secured creditors is longer than the payment term to unsecured creditors." *In re Arden Properties*, 248 B.R. at 174.

## IV. Conclusion

For the foregoing reasons, the Bankruptcy Court's confirmation order is hereby vacated and remanded for proceedings consistent with this decision. Specifically, the Bankruptcy Court, on remand, should consider the following questions: (1) does the debtor's plan, by extinguishing Mercury's pre-petition guarantees, comply with the best interests of the creditors test as set forth in 11 U.S.C. § 1129(a)(7); (2) should the debtor's plan include a provision that requires USLR, the debtor's general partner, to fund the plan; (3) is the debtor's plan's different treatment of Mercury's and Milford's claims justified because of the different nature of the relative claims; and (4) is the interest rate payable to Mercury fair and equitable as defined by 11 U.S.C. § 1129(b)(1). The clerk shall close this file.

It is so ordered.