**IN RE: ALLIED CONSOLIDATED INDUSTRIES, INC., Debtor/Debtor-in-Possession.**

**CASE NUMBER 16–40675 (Substantively Consolidated)**

United States Bankruptcy Court, N.D. Ohio.

Signed June 19, 2017

Joseph R Macejko, Suhar & Macejko LLC, Youngstown, Oh, Debtor/Debtor-in-Possession.

## MEMORANDUM OPINION OVERRULING OBJECTION OF UNITED STATES STEEL CORPORATION TO CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION

Kay Woods, United States Bankruptcy Judge

On May 2, 2017, Debtors and Debtors-in-Possession Allied Consolidated Industries, Inc., Allied Erecting & Dismantling Co., Inc., Allied Industrial Scrap, Inc. ("AIS"), and Allied–Gator, Inc. ("AGI") (collectively, "Debtors") and the Official Committee of Unsecured Creditors ("Committee") jointly filed Second Amended Joint Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors ("Joint Plan") (Doc. 356). On May 31, 2017, United States Steel Corporation ("U. S. Steel") filed Objection of United States Steel Corporation to Con-

firmation of Second Amended Joint Plan of Reorganization ("Objection") (Doc. 364), which is presently before the Court.

The Court held a hearing to consider confirmation of the Joint Plan on June 7, 2017, which hearing was continued to and concluded on June 14, 2017 ("Confirmation Hearing"). At the Confirmation Hearing, the Court heard the testimony of (i) John K. Lane of Inglewood Associates, LLC, Crisis Manager for the Debtors and proposed "Creditor Trustee"[1]; and (ii) Michael R. Ramun, Sales and Marketing Manager for AGI. The Court admitted into evidence Joint Exhibits 1 through 19 and U. S. Steel Exhibit 8. Upon conclusion of the Confirmation Hearing, the Court orally approved confirmation of the Joint Plan and overruled the Objection. The Court enters this Memorandum Opinion and accompanying Order to memorialize its overruling of the Objection.[2]

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and General Order No. 2012–7 entered in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408, and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. BACKGROUND

On April 13, 2016, the Debtors filed voluntary petitions pursuant to chapter 11 of Title 11. The Debtors' cases were substantively consolidated on July 11, 2016 (*see* Doc. 123).

---

1. Creditor Trustee is defined in Article I of the Joint Plan at page 4.

2. To the extent the Court's oral ruling may be inconsistent with this Memorandum Opinion and accompanying Order, the Memorandum Opinion and Order shall control.

On March 9, 2017, the Debtors and the Committee jointly filed (i) First Joint Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors (Doc. 313); and (ii) First Disclosure Statement for Joint Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors (Doc. 314). A hearing to consider approval of the Joint Disclosure Statement was scheduled for April 25, 2017 ("Disclosure Hearing") (*see* Doc. 317).

The day prior to the Disclosure Hearing, the Debtors and the Committee jointly filed (i) First Amended Joint Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors (Doc. 345); and (ii) Amended First Disclosure Statement for Joint Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors ("Joint Disclosure Statement") (Doc. 346).

At the Disclosure Hearing, the Court conditionally approved the Joint Disclosure Statement as modified on the record. The Court directed the Debtors and the Committee to file a second amended joint plan of reorganization and a second amended joint disclosure statement to incorporate the changes to those documents conditionally approved by the Court at the Disclosure Hearing.

On May 2, 2017, the Debtors and the Committee jointly filed (i) the Joint Plan; and (ii) Amended Second Disclosure Statement for Joint Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors ("Final Joint Disclosure Statement") (Doc. 357). On that same date, the Court entered Order (a) Approving Second Amended Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization; (b) Setting Deadline for Return of Ballots; (c) Setting Confirmation Hearing; and (d) Setting Deadline for Objection to Confir-

mation of the Proposed Second Amended Joint Chapter 11 Plan of Reorganization (Doc. 358), in which the Court, *inter alia*, approved the Final Joint Disclosure Statement and scheduled a hearing to consider confirmation of the Joint Plan on June 7, 2017.

On May 31, 2017, U. S. Steel filed its Objection, and, on June 6, 2017, the Committee filed Official Committee of Unsecured Creditors' Response to Objection of United States Steel Corporation to Confirmation of Second Amended Joint Plan of Reorganization (Doc. 369).

On June 1, 2017, the Debtors filed Ballot Tabulation Report (Doc. 366), in which the Debtors represented that 42 of 43 voting creditors accepted the Joint Plan. Specifically, Classes 1, 3, 4, 5, 6, and 7 voted in favor of the Joint Plan. Class 2, consisting only of U. S. Steel, voted to reject the Joint Plan.

At the June 7, 2017 Confirmation Hearing, the following parties appeared: (i) Andrew W. Suhar, Esq., Melissa M. Macejko, Esq., and Joseph R. Macejko, Esq. on behalf of the Debtors; (ii) Frederic P. Schwieg, Esq. on behalf of the Committee; (iii) Charles M. Oellermann, Esq., Michael R. Gladman, Esq., and David M. Belczyk, Esq. on behalf of U. S. Steel; (iv) Amy L. Good, Esq. on behalf of Daniel M. McDermott, United States Trustee for Region 9 ("UST"); (v) Harry A. Readshaw, Esq., on behalf (a) Eckert Seamans Cherin & Mellot, LLC, (b) Nadler Nadler & Burdman Co., LPA, and (c) Anness Gerlach & Williams, Inc. (collectively, the "Professionals"); (vi) Scott A. Norcross, Esq. on behalf of Norfolk Southern Railway Co. ("Norfolk Southern"); and (vii) Jonathan K. Schoenike, Esq. on behalf of Michael D. Ramun.

At the June 14, 2017 Confirmation Hearing, the following parties appeared: (i) Mr.

Suhar and Ms. Macejko on behalf of the Debtors; (ii) Mr. Schwieg on behalf of the Committee; (iii) Messrs. Oellermann, Gladman, and Belczyk on behalf of U. S. Steel; (iv) Ms. Good on behalf of the UST; (v) R. Scott Heasley, Esq. on behalf of Norfolk Southern; and (vi) Mr. Schoenike on behalf of Michael D. Ramun.

## II.  ANALYSIS

The Objection contains several discrete objections to the Joint Plan. Two objections asserted by U. S. Steel have been resolved by agreement and modification on the record at the Confirmation Hearing: (i) the Debtors have agreed to use language offered by U. S. Steel to modify certain alleged contradictory and/or ambiguous provisions of the Joint Plan; and (ii) the Debtors have agreed that the "Fairless Agreements" would be rejected rather than assumed.[3] The remaining objections can be summarized, as follows:

First, the Joint Plan is mischaracterized as a plan of reorganization, whereas it actually provides for liquidation of the Debtors' assets rather than reorganization of the Debtors' business operations. Second, the Joint Plan fails to meet the best-interest-of-creditors test in 11 U.S.C. § 1129(a)(7), which requires the Joint Plan to provide U. S. Steel with no less than what it would receive if the Debtors' assets were liquidated under chapter 7. Third, the Joint Plan is not feasible. Fourth, the Joint Plan does not comply with the cramdown standard in 11 U.S.C. § 1129(b)(2)(A) with respect to U. S. Steel's claim. The Court will address each of these objections, in turn.

3.  The Fairless Agreements are defined in Section 7.1 of the Joint Plan.

## A.  The Joint Plan Is Not a Plan of Reorganization

■ Turning to the first objection, the Court finds that the Joint Plan is a plan of reorganization. U. S. Steel asserts that the Joint Plan is a liquidating plan because it falls squarely under 11 U.S.C. § 1141(d)(3), which provides:

[d](3) The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3) (2017). Here, there is no question that the Joint Plan provides for the liquidation of substantially all of the Debtors' property and that the Debtors would not be entitled to a discharge if this case were a chapter 7 case. Thus, the requirements in subparagraphs (A) and (C) are met. However, because 11 U.S.C. § 1141(d)(3) is in the conjunctive, all three provisions of this subsection must be met for the Joint Plan to be a liquidating plan. The Court finds that Joint Plan does not meet the requirement in subparagraph (B).

The Joint Plan provides for the Debtors to engage in business after consummation of the Joint Plan. Section 8.2 of the Joint Plan, which defines "Trust Assets," provides that the "Reorganized Debtor" will continue operations post-confirmation during the time the "Creditor Trust" is liquidating assets.[4] Section 8.2(d) of the Joint Plan provides for certain income from the

4.  Reorganized Debtor is defined in Article I of the Joint Plan at page 7, and Creditor Trust is defined in Article I of the Joint Plan at page 4.

Reorganized Debtor's ongoing operations to be contributed to the Creditor Trust; specifically, "[t]he net income from scrap processing operations of AIS and the ongoing sales and other operations of the hydraulic shear business known as AGI." (Jt. Plan § 8.2(d).) Section 8.3(b) of the Joint Plan states, "The [Joint] Plan contemplates that operations income from AIS and AGI will be used to fund the [Joint] Plan." (*Id.* § 8.3(b) (n.4 omitted).) The Joint Plan further states, "Upon termination of the Creditor Trust, all remaining assets of the Creditor Trust will vest with the Reorganized Debtor. It is anticipated that this will include, among other assets, the operating assets of the hydraulic shear business knowns [sic] as AGI." (*Id.* § 8.9.)

In *Financial Security Assurance, Inc. v. T–H New Orleans Limited Partnership (In re T–H New Orleans, Limited Partnership)*, 116 F.3d 790 (5th Cir. 1997), the Fifth Circuit Court of Appeals held that 11 U.S.C. § 1141(d)(3) did not apply because "T–H NOLP's conducting business for two years following Plan confirmation satisfies § 1141(d)(3)(B)." *Id.* at 804 n.15 (citation and parenthetical omitted). In the present case, the Joint Plan provides for the Reorganized Debtor to continue the business operations of AIS and AGI post-confirmation, which negates one of the required elements of 11 U.S.C. § 1141(d)(3). Thus, the Court will overrule U. S. Steel's first objection.

## B. U. S. Steel Would Fare Better in a Chaptér 7 Liquidation

■ The second objection posed by U. S. Steel is that the Joint Plan fails to meet the best-interests-of-creditors test in 11 U.S.C. § 1129(a)(7).

> (a) The court shall confirm a plan only if all of the following requirements are met:

> &ast; &ast; &ast;

> (7) With respect to each impaired class of claims or interests—

> > (A) each holder of a claim or interest of such class—

> > (i) has accepted the plan; or

> > (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1129(a)(7) (2017). U. S. Steel's claim is in an impaired class, and U. S. Steel did not vote to accept the Joint Plan. Accordingly, U. S. Steel must receive or retain under the Joint Plan no less than it would receive or retain if the Debtors' assets were liquidated under chapter 7.

U. S. Steel argues that it would fare better if the Debtors' assets were liquidated under chapter 7. U. S. Steel spends a great deal of time arguing that the Debtors have under-valued their assets in the "Liquidation Analysis,"[5] asserting that creditors would be paid in full with interest if the case were converted to chapter 7.[6] This is a curious argument given that the Joint Plan proposes payment to all credi-

---

5. The Liquidation Analysis is in Exhibit 8 to the Final Joint Disclosure Statement, as described in Article IV(D) of the Final Joint Disclosure Statement.

6. U. S. Steel relies on a Gordon Brothers valuation from mid–2015 in arguing that the

Debtors have undervalued their assets in the liquidation analysis. Whether or not this valuation is an accurate reflection of the present liquidation value of the Debtors' assets is not relevant if the Joint Plan—as it does—provides for U. S. Steel to receive a full recovery.

tors—including U. S. Steel—in full plus interest at the rate of six percent per annum. Nowhere does U. S. Steel challenge the premise in the Joint Plan that all creditors will be paid in full. Nor does U. S. Steel ever argue that the six percent interest rate is not adequate to fully compensate it for the time value of money. Since the Joint Plan provides that U. S. Steel will be paid in full, plus interest, how can U. S. Steel fare better under a chapter 7 liquidation? How can being paid in full plus interest under a chapter 7 liquidation, as U. S. Steel argues would occur, be better than being paid in full plus interest under the Joint Plan? The outcomes under the Joint Plan and U. S. Steel's version of a liquidation analysis result in the same benefit to U. S. Steel.

Not only does U. S. Steel fail to argue that the 100 percent payout under the Joint Plan is inflated or unlikely, Mr. Gladman appears to have acknowledged that the Joint Plan will pay creditors in full. At the June 7, 2017 hearing regarding a motion to compromise, which U. S. Steel has opposed, Mr. Gladman argued that there was no need to escrow the amount of the disputed secured portion of the claims asserted by the Professionals because the Professionals were adequately protected under the Joint Plan's distribution scheme.[7] Mr. Gladman stated:

> This notion about whether or not the money for the professionals would need to be held in escrow if the settlement is rejected, we don't believe that that's the case. The issue here is whether or not the professionals' interest is adequately preserved and that can be accomplished without a cash escrow.
>
> Indeed, the debtor has proposed a 100 percent plan here and has projected in its plan and disclosure statement that they will generate approximately $24,000,000.00 compared to $16,000,000.00 in claims. There is more than enough to satisfy the professionals' liens if those are ultimately found to be valid. Of course, the professionals could also monitor the reports that are going to be provided by the creditor trust, and, if at some time it appears that there actually might be a shortfall to secure that claim, they could come back to the court and ask for an escrow at that point.

(June 7, 2017 Hr'g at 12:18:03 p.m. (emphasis added).)

U. S. Steel makes additional arguments concerning how it is disadvantaged by its treatment under the Joint Plan. It argues that the "crux" of its objection to the Joint Plan is the "extraordinary constraint on the marketing of the real estate" to which U. S. Steel's judgment lien attaches. U. S. Steel argues that there is no assurance that the real estate will ever be sold. This is simply not the case. The real estate identified in Sections 8.2(j) and (k) of the Joint Plan is included in the Trust Assets to be contributed to the Creditor Trust. Section 8.6 of the Joint Plan provides, "The Creditor Trust shall continue until all Unclassified Claims and Class 1 through 5 [sic] Claims and the allowed Claim of Michael D. Ramun in Class 6 are paid in full or the Trust Assets are liquidated and all proceeds are paid out to the appropriate parties." (Jt. Plan § 8.6.) Thus, the Joint Plan provides assurance that the real estate will be sold.

U. S. Steel argues that a 24–month period to market and sell the real estate is too long. U. S. Steel states that, although the Final Joint Disclosure Statement sets forth a 24–month period for the sale of the

---

**7.** The Professionals have filed three proofs of claims in the combined amount of $1,790,789.60, which they assert are fully secured. (*See* Claim Nos. 24–1, 25–1, and 34–1.)

real estate, the Joint Plan has no such provision. U. S. Steel is technically correct regarding the express provisions in the Joint Plan; however, U. S. Steel ignores the Creditor Trust Agreement, which is attached to the Joint Plan as Exhibit A. The Creditor Trust Agreement explicitly states:

> Notwithstanding anything to the contrary in this Agreement, in no event shall the Trustee unduly prolong the duration of the Trust, and the Trustee shall, in the exercise of its reasonable business judgment and in the interest of the Beneficiaries, at all times endeavor to (i) liquidate the Trust Property to maximize net recoveries and (ii) otherwise terminate the Trust as soon as practicable in accordance with this Agreement.

(Creditor Trust Agreement § 3.1.) Mr. Lane testified that he considered the outside date for the Creditor Trustee to sell the real estate at auction to be 24 months after the "Effective Date." [8] The provision in the Creditor Trust Agreement, coupled with the testimony of Mr. Lane, is sufficient for the Court to find that the marketing and sale of the real estate will occur within 24 months, which is reasonable considering the large number of parcels and the nature of the real estate. A 24–month period to market and sell the real estate is not outside the range of reasonableness, not an "extraordinary" length of time, and does not disadvantage U. S. Steel.

U. S. Steel cites *Central Bank of Kansas City v. Orlando (In re Orlando)*, 53 B.R. 245 (Bankr. W.D. Mo. 1985) as being remarkably similar to the facts before this Court. This Court, however, finds *In re Orlando* to be distinguishable rather than remarkably similar. In *In re Orlando*, the bankruptcy court dealt with the debtors' request for a stay of two orders, one granting relief from the automatic stay and the other converting the case from chapter 11 to chapter 7. The debtors had proposed a plan that included an indefinite period of time to sell real estate, while at the same time not providing for any adequate protection payments to creditors. Unlike in the Joint Plan before this Court, the bankruptcy court in *In re Orlando* found that the "proposals of the debtors, . . . entail only that payment will be made at a date in the future, which is uncertain, and that no payments of interest, either as adequate protection or as interest payments under a confirmed plan, will be made." *Id.* at 247. Also unlike the present case where U. S. Steel has a judgment lien in an unknown secured amount, the secured creditors in *In re Orlando* had consensual liens from the extension of credit. As a judgment lienholder, rather than a consensual lienholder, U. S. Steel would not be entitled to adequate protection payments. The Joint Plan provides for a reasonable, finite period of time for the Creditor Trustee to market the real estate and also provides for the payment of interest at six percent per annum until the claims are paid.

A case more on point is *Mercury Capital Corporation v. Milford Connecticut Associates, L.P.*, 354 B.R. 1 (D. Conn. 2006). In *Mercury Capital*, the bankruptcy court had approved the debtor's plan, which provided for the sale of certain real estate over a 30–month period, over a competing secured creditor's proposed plan, which provided for the sale of the same real estate within one year. The confirmation order was vacated and remanded to the bankruptcy court for further proceedings consistent with the district court's decision. Notwithstanding the remand, however, the district court favorably noted, "The Bank-

---

**8.** Effective Date is defined in Article I of the Joint Plan at page 4.

ruptcy Court's decision reasonably reflects the view that, by marketing the property, the debtor's plan will give all creditors the best chance to be paid." *Id.* at 9. The 30–month period to market and sell the real estate in *Mercury Capital* exceeds the contemplated 24–month marketing and sale period in the Joint Plan. This Court accordingly finds that the 24–month marketing and sale period is reasonable.

As further evidence of the undue delay in the Joint Plan, U. S. Steel referenced the testimony of Mr. Lane that, since December 2016, (i) he had not had any communications with the listing real estate agent; and (ii) the Debtors have taken no action to market any real or personal property. Mr. Lane testified that he had stopped trying to market and sell the Debtors' property when the UST and U. S. Steel each filed motions to convert this case to chapter 7 on February 6, 2017 and February 8, 2017, respectively (*see* Docs. 272 and 276). While the motions to convert were pending, Mr. Lane said that he refrained from marketing efforts because it was uncertain if the Debtors would have the authority to close on any negotiated sales if this case were to be converted. The Court finds Mr. Lane to be a credible witness, credits his testimony, and finds that the delay in marketing the Debtors' property is a result of the uncertainty injected into this case by, among other things, U. S. Steel's own actions in filing the motion to convert.

There is no support for U. S. Steel's argument that it is disadvantaged by artificial constraints on the marketing of U. S. Steel's collateral. U. S. Steel argues that it would not face the same time constraints in a chapter 7 liquidation, but provides no support for this argument. A chapter 7 trustee would have to review and evaluate the Debtors' assets and determine how to sell such assets to maximize the proceeds for creditors. It is unknown how long it might be before a chapter 7 trustee would be in a position to sell the real estate. There is no evidence that a chapter 7 trustee's marketing period would be any shorter than the marketing period utilized by the Creditor Trustee. Any orderly liquidation by a chapter 7 trustee would likely take as long as the time contemplated in the Joint Plan.

U. S. Steel also objects that the Joint Plan does not acknowledge all of its collateral, arguing that certain categories of equipment that the Joint Plan treats as personal property are actually fixtures to the real estate to which its lien attaches. U. S. Steel argues that the Joint Plan does not acknowledge that its judgment lien extends to all categories of the Debtors' real property, including improvements and fixtures. However, U. S. Steel's assertion that certain categories of equipment constitute fixtures does not make it so. Whether or not any specific piece of equipment constitutes part of the real estate depends upon whether it meets the definition of a fixture in the Ohio Revised Code. This is a mixed question of law and fact.

Ohio law is quite specific regarding the definition and characterization of fixtures. Ohio Revised Code § 5701.02 provides the following definition of "fixture".

§ 5701.02. Definitions relating to real property

(C) "Fixture" means an item of tangible personal property that has become permanently attached or affixed to the land or to a building, structure, or improvement, and that primarily benefits the realty and not the business, if any, conducted by the occupant on the premises.

*Showe Mgmt. Corp. v. Kerr (In re Kerr),* 383 B.R. 337, 341–42 (Bankr. N.D. Ohio 2008) (quoting O.R.C. § 5701.02(C) (2008)).

The Court finds no support for U. S. Steel's contention that it would not face this same issue regarding its collateral in a chapter 7 liquidation. To the contrary, a chapter 7 trustee would have a fiduciary duty to all creditors and would have to make a determination, which might involve litigation, concerning what, if any, items of equipment come within the purview of U. S. Steel's judgment lien. There is no reason to believe that a chapter 7 trustee's position concerning what constitutes personal and real property would differ from the categories in the Joint Plan.

Although the Debtors and U. S. Steel disagree about whether certain property constitutes personal property or real property, these disputes do not have to be resolved for purposes of confirmation. They can be resolved when any such property is sold and the Creditor Trustee seeks Court approval of such sale.

Last, U. S. Steel objects on the basis that it is penalized because the Joint Plan provides for the escrow of $1.2 million from the sale of equipment to which the Professionals' lien allegedly attaches pending resolution of the validity of such lien. U. S. Steel offers no support for its contention that it is penalized. At the June 7, 2017 Confirmation Hearing, the Professionals agreed to cap their secured claims at $1,200,000.00, which constitutes approximately two-thirds of the Professionals' claims. But for the conceded reduction in the secured amount of the Professionals' claims, approximately $1,800,000.00—*i.e.*, the entire amount of Professionals' claims—would have had to be escrowed pending resolution of the validity of the Professionals' lien. Moreover, even if the Professionals' lien is eventually avoided, the proceeds of the equipment sale being held in escrow would not inure to the benefit of U. S. Steel, but instead would be distributed to unsecured creditors, as set forth in the Joint Plan.

For the foregoing reasons, the Court will overrule U. S. Steel's objection based on 11 U.S.C. § 1129(a)(7).

## C. The Joint Plan Is Not Feasible

■ For its third objection, U. S. Steel argues that the Joint Plan is not feasible. Section 1129(a)(11) provides that a plan will be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. 1129(a)(11) (2017). U. S. Steel relies primarily on the Debtors' monthly operating reports to demonstrate that the Debtors have been losing money since the inception of this case. It also relies on Exhibit 3 to the Final Joint Disclosure Statement to show that the Debtors incurred "substantial losses" for the year ending March 31, 2016. Mr. Lane was questioned extensively about the Debtors' monthly operating reports and testified that the deductions for amortization and depreciation as current operating expenses, which are an accounting function, were "meaningless" for the Debtors. Mr. Lane explained that these expenses mostly relate to the $40,000,000.00 that the Debtors spent to construct the manufacturing facility, which, all parties agree has a fair market value of far less than $40,000,000.00. These expenses were originally included as operating expenses based on accounting principles, but were moved "below the line" as non-operating expenses beginning with the January 2017 operating report.[9] Thereaf-

---

9. The Debtors' January 2017 monthly operating report was admitted as Joint Exhibit 12 and is filed on the docket at Doc. 288.

ter, with the proper allocation of amortization and depreciation, the Debtors have shown a net operating profit. The Court finds Mr. Lane's explanation to be credible and further finds that the monthly operating reports showing amortization and depreciation as operating expenses do not reflect the Debtors' true operations.

Additionally, U. S. Steel argues that the testimony of Michael R. Ramun, Sales and Marketing Manager for AGI, demonstrates the Joint Plan's lack of feasibility. Michael R. Ramun testified that he had no knowledge of any written business plans for AGI or post-reorganization plans regarding employees, tasks, or products for AGI. However, Michael R. Ramun is not a principal of the Debtors and has no responsibility for the development of business plans, so his lack of knowledge about any such plans is not determinative of the feasibility of AGI. Moreover, Mr. Lane, who has been acting as Crisis Manager for the Debtors, testified that AGI has been profitable post-petition and that he is "confident" AGI could be profitable in the future. Again, the Court finds Mr. Lane's testimony to be credible. For these reasons, the Court will overrule U. S. Steel's objection on the basis that the Joint Plan is not feasible.

### D. The Joint Plan Cannot Be Crammed Down

■ The fourth objection asserted by U. S. Steel is that the Joint Plan cannot be crammed down. 11 U.S.C. § 1129(b)(2) requires that the Joint Plan be fair and equitable and that it not unfairly discriminate.

> [B](2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)
>
> (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.
>
> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, . . . .

11 U.S.C. § 1129(b)(2) (2017).

U. S. Steel has filed a proof of claim in the amount of $10,648,216.47, in which U.

S. Steel asserts that its claim is secured in an "unknown" amount. (Claim No. 32–1, part 1 at 9.) The Joint Plan provides for U. S. Steel's claim in Class 2 and bifurcates the claim as an estimated secured claim in the amount of $2,684,754.52 ("Estimated Secured Claim") and an estimated unsecured claim in the amount of $8,000,000.00 ("Estimated Unsecured Claim"). The Joint Plan provides for U. S. Steel to retain its lien on the real estate and receive interest at the rate of six percent until the Estimated Secured Claim is paid when the real estate is sold. U. S. Steel's lien will attach to the proceeds of the sale of the real estate. Thus, the requirement in § 1129(b)(2)(A) is met.

As set forth above, the Joint Plan provides for payment in full of all classes of claims. With respect to the Estimated Unsecured Claim, the Joint Plan is also fair and equitable because the requirement of § 1129(b)(2)(B) are met. The Estimated Unsecured Claim is treated pro rata with all other unsecured claims in Classes 3 and 5.

There is no support for U. S. Steel's contention that it has to be paid prior to the unsecured creditors potentially being paid in full. As set forth above, the Joint Plan provides for payment in full of all classes of claims.

[I]t is important to underscore what compliance with any of the three clauses in section 1129(b)(2)(A) entails: payment in full of the secured claim. As a result, there can be no fair and equitable argument because of this full payment, even though the secured lender is being paid over time when junior classes, such as unsecured creditors, may be paid sooner. "It must be remembered that the

absolute priority rule does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan."

7-1129 Collier on Bankruptcy ¶ 1129.04[2] (16th ed. 2017) (n.10 omitted). Because the Joint Plan provides for distributions of 100 percent of each class of claims, there can be no argument that the Joint Plan is not fair and equitable.

■■■ U. S. Steel also argues that the Joint Plan unfairly discriminates with respect to both its Estimated Secured Claim and its Estimated Unsecured Claim. "The code only prohibits discrimination between classes if the discrimination is unfair. A plan unfairly discriminates against a class if similar claims are treated differently without a reasonable basis for the disparate treatment." *Mercury Capital Corp. v. Milford Conn. Assocs.*, 354 B.R. 1, 10 (D. Conn. 2006). No other creditor is in the same position as U. S. Steel. There is no way to know the actual secured value of U. S. Steel's claim.[10] Although U. S. Steel claims to be similarly situated to Norfolk Southern, that is not the case. Norfolk Southern filed Claim No. 21–1 in the amount of $244,029.47 claiming to be secured on the basis of a judgment lien filed approximately one week prior to the April 13, 2016 petition date. Consequently, because the Norfolk Southern judgment lien is subject to avoidance, the Joint Plan treats Norfolk Southern's entire claim, which is dealt with in Class 3, as unsecured. U. S. Steel argues that the entirety of its proof of claim should also be paid pro

---

**10.** U. S. Steel acknowledges this in its proof of claim wherein it states that the amount of the secured claim is "unknown." (Claim No. 32–1, part 1 at 9.) When the Court inquired at

an earlier hearing if there was any disagreement about the amounts of the bifurcation, U. S. Steel's counsel indicated the monetary split was not objectionable.

rata with other unsecured claims, while at the same time arguing that it has a security interest in all of the real estate and all categories of equipment that are fixtures to the real estate. U. S. Steel argues that, if the real estate sells for less than the Estimated Secured Claim, it may never be paid in full. Because U. S. Steel has conceded that the value of the Debtors' assets exceeds the total amount of the claims, there is no basis for U. S. Steel's argument that it may not be paid in full. Since the value of the Estimated Secured Claim is merely estimated, if U. S. Steel is paid less on its Estimated Secured Claim, the value of the Estimated Unsecured Claim will increase commensurately. U. S. Steel's argument actually boils down to timing, but since the Joint Plan contemplates that U. S. Steel will be paid in full plus interest, the mere possibility that Norfolk Southern or Class 5 general unsecured creditors may be paid in full prior to U. S. Steel being paid does not remove the Joint Plan from the cramdown provisions in 11 U.S.C. § 1129(b)(2).

U. S. Steel argued at the Confirmation Hearing that it was entitled to be paid pro rata on 100 percent of the value of its claim. Under that hypothetical, if U. S. Steel received payment on the Estimated Secured Claim as a result of real estate sales, it would have then been paid disproportionately more on its Estimated Unsecured Claim than other general unsecured creditors. Thus, in U. S. Steel's view, the only way for it not to be unfairly discriminated against is for it to unfairly discriminate against other unsecured claims. Although 11 U.S.C. § 1111(b)(2) provides for a class of secured creditors to elect to have their claims treated as secured to the extent that such claims are allowed, there is no complementary provision that entitles U. S. Steel to elect to have its entire claim treated as unsecured, while still asserting it has a secured claim.

For the reasons stated, the Court finds that U. S. Steel's objection regarding cramdown is without merit.

## III. CONCLUSION

U. S. Steel has four fundamental objections to confirmation of the Joint Plan, each of which this Court overrules. First, the Joint Plan is, in fact, a plan of reorganization. AIS and AGI will continue to operate following the Effective Date, and the Joint Plan contemplates that AGI will continue to operate after termination of the Creditor Trust. Second, the Joint Plan meets the best-interest-of-creditors test in 11 U.S.C. § 1129(a)(7) because U. S. Steel will receive the same value under either the Joint Plan or a chapter 7 liquidation. Third, the Joint Plan is feasible, as exhibited through the testimony of Mr. Lane. Finally, the Joint Plan meets the cramdown requirements in 11 U.S.C. § 1129(b)(2)(A) because it is fair and equitable and does not unfairly discriminate against U. S. Steel.

## ORDER OVERRULING OBJECTION OF UNITED STATES STEEL CORPORATION TO CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION

On May 2, 2017, Debtors and Debtors-in-Possession Allied Consolidated Industries, Inc., Allied Erecting & Dismantling Co., Inc., Allied Industrial Scrap, Inc., and Allied–Gator, Inc. (collectively, "Debtors") and the Official Committee of Unsecured Creditors jointly filed Second Amended Joint Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors ("Joint Plan") (Doc. 356). On May 31, 2017, United States Steel Corporation ("U. S. Steel") filed Objection of United States Steel Corporation to Confirmation of Second Amended Joint Plan of

Reorganization ("Objection") (Doc. 364), which is presently before the Court.

The Court held a hearing to consider confirmation of the Joint Plan on June 7, 2017, which hearing was continued to and concluded on June 14, 2017 ("Confirmation Hearing"). At the Confirmation Hearing, the Court heard the testimony of (i) John K. Lane of Inglewood Associates, LLC, Crisis Manager for the Debtors and proposed "Creditor Trustee"[1]; and (ii) Michael R. Ramun, Sales and Marketing Manager for AGI. The Court admitted into evidence Joint Exhibits 1 through 19 and U. S. Steel Exhibit 8. Upon conclusion of the Confirmation Hearing, the Court orally approved confirmation of the Joint Plan and overruled the Objection.

For the reasons set forth in the Court's Memorandum Opinion Overruling Objection of United States Steel Corporation to Confirmation of Second Amended Joint Plan of Reorganization entered on this date, the Court hereby finds:

1. The Joint Plan is a plan of reorganization;

2. The Joint Plan meets the best-interest-of-creditors test in 11 U.S.C. § 1129(a)(7);

3. The Joint Plan is feasible; and

4. The Joint Plan meets the cramdown requirements in 11 U.S.C. § 1129(b)(2)(A).

As a consequence, the Court hereby overrules U. S. Steel's Objection.

**IT IS SO ORDERED.**

---

1. Creditor Trustee is defined in Article I of the Joint Plan at page 4.